**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**v.**                                                    **1:06-CR-165**
                                                              **(GLS)**

**TODD O'BRIEN,**

                           **Defendant.**

**APPEARANCES:**                          **OF COUNSEL:**

**FOR THE UNITED STATES:**

HON. GLENN T. SUDDABY            THOMAS SPINA, JR.
United States Attorney                  Assistant U.S. Attorney
445 Broadway
218 James T. Foley U.S. Courthouse
Albany, New York 12207-2924

**FOR THE DEFENDANT:**

KINDLON, SHANKS LAW FIRM        KENT B. SPROTBERY, ESQ.
74 Chapel Street
Albany, New York 12207

**Gary L. Sharpe**
**U.S. District Judge**

**Memorandum-Decision and Order**

**I.  Introduction**

    Following his indictment for possession of child pornography, *see* 18

U.S.C. §§ 2252A(a)(5)(B), 2256(8), Todd O'Brien moved to suppress three statements he made to police officers and evidence seized during three searches. *See Dkt. No. 18*; FED. R. CRIM. P. 12(b)(3)(C).  Following the government's response, *see Dkt. No. 19*, and a suppression hearing, the parties supplemented their initial submissions. *See Dkt. Nos. 20, 22-3*. For the following reasons, the motion is denied in its entirety.

## II. <u>Facts</u>

The facts are based on the court's evaluation of the following:  the applicable burden of production and proof; testimony of Police Officers Schatzel and Sheeley; hearing exhibits; O'Brien's non-testimonial affidavit and a transcript of his State suppression hearing testimony; a State appellate decision, *see People v. O'Brien*, 2 A.D.3d 1222 (3d Dep't 2003); the parties' submissions; and the resolution of credibility issues. *See* FED. R. CRIM. P. 12(d); *see also U.S. v. Miller*, 382 F. Supp. 2d 350, 361-363 (N.D.N.Y. 2005) (burden of production and proof).

Todd O'Brien is a college-educated music teacher who taught at the Kingston High School.  On May 4, 2001, S.S., a seventeen-year-old female student, gave Assistant Vice-Principal Stoutenberg a letter, and spoke with him about its content.  From the letter and the conversation, Stoutenberg

learned that S.S. met O'Brien through an online chat room, and the two engaged in repetitive internet and telephone sexual conversations. O'Brien was at his residence during these conversations. At O'Brien's urging, they mutually masturbated over the internet and O'Brien suggested future sexual relations. S.S. also disclosed that at least two other female students, M.D. and A.S., had similar experiences with O'Brien during the preceding two years. It is reasonable to conclude from S.S.'s disclosures that she may have been sixteen when her relationship with O'Brien began. *See 12/20/06 Hearing Gov't Ex. 1*.

After Stoutenberg received the letter and spoke with S.S., he asked O'Brien to come to the school's administrative offices. There, O'Brien was questioned about S.S.'s letter by other school officials. He denied any sexual conversations, including conversations about mutual masturbation.

Contemporaneously, Stoutenberg reported S.S.'s allegations to the Kingston Police Department. Detective Schatzel was sent to the school to begin an investigation. Dressed in civilian clothing, he drove there in an unmarked police car. When he arrived, he was briefed by Stoutenberg and given S.S.'s letter.

Having read the letter and spoken with both his assigning supervisor

3

and Stoutenberg, Schatzel understood that his investigative focus was whether O'Brien had engaged in inappropriate sexual conversations with under-aged students, both by telephone and over the internet.  Because he knew that S.S. had emotional difficulties, he decided to investigate discretely to avoid unnecessary damage to O'Brien's reputation.

After O'Brien finished his conversation with school officials, Schatzel introduced himself, and asked if O'Brien would accompany him to the police station to further discuss the allegations.  O'Brien agreed, and rode in Schatzel's unmarked car.  O'Brien sat in the front seat, he was not restrained in any way, and there was no verbal or physical suggestion that he was under arrest.  There was no conversation in the car.  According to O'Brien, Schatzel intimidated him, and required him to ride in the police car.  *See O'Brien State Testimony*, *Ex. 13; Aff., Dkt. No. 18*.  The court discredits O'Brien's non-testimonial assertion.  *See Miller*, 382 F. Supp. 2d at 362-63 (The weight afforded non-testimonial hearsay may be influenced "by more cogent evidence, especially that which withstands the scrutiny of cross-examination.").

When the two arrived at the station, they went to an office located within the confines of the Detective Division.  Schatzel used an office

4

instead of a formal interview room out of respect for O'Brien's professional position and because O'Brien was neither a threat nor under arrest.  At 3:30 P.M., sitting at a desk across from one another, O'Brien and Schatzel began to discuss the content of S.S.'s letter.

After Schatzel revealed S.S.'s allegations, O'Brien admitted that he frequently spoke with S.S. and other students, including M.D., on the telephone and over the internet from his home computer, a Compaq USA ("Comp").  He admitted that he spoke with S.S. a couple of times a week including earlier that week, and that he communicated with M.D. online two days earlier.  He admitted that during the preceding two years he engaged in sexually suggestive conversations with students in person and online, but claimed that the conversations were "joking in nature."

During the interview, O'Brien told Schatzel that the Comp and its monitor were located in his bedroom.  However, there was no discussion about a Gateway computer ("Gateway") subsequently found in O'Brien's bedroom, nor was there any conversation about computer-related items such as peripheral equipment (other than the Comp monitor), storage devices such as disks or CD's, or computer-generated materials such as hard copies of documents or photographs typically stored on a computer.

5

At the end of the conversation, Schatzel asked O'Brien if he would allow the police to take his computer and monitor for inspection, and O'Brien agreed.  Schatzel retrieved a standard consent to search form and filled it out in O'Brien's presence.  *See Gov't Consent to Search Form*; *Dkt. No. 19*, *Ex. C*.  Signed by Schatzel and O'Brien at 5:35 P.M., it authorized the police to seize O'Brien's Comp and monitor located in his bedroom at home.  The form fully advised O'Brien of his constitutional rights regarding the search.  As relevant, it provided:

> I, Todd Obrien (*sic.*) 115 Arnold Drive, Kingston, NY, having been requested to consent to a search of my Comp USA Computer/Monitor located at 115 Arnold Drive my 1st Flr (*sic.*) Bedroom and having been duly advised of my constitutional rights to (1) refuse such consent, (2) to require that a search warrant be obtained prior to any search, (3) that if I do consent to a search, any evidence found as a result of such search, can and will be used against me in any civil or criminal proceedings, (4) that I may consult with an attorney of my choosing before or during the search and (5) that I may withdraw my consent to search at any time prior to its conclusion.  After having been advised of my constitutional rights, I hereby knowingly, intelligently and voluntarily waive my rights and consent to a search and authorize Detective G. Schatzel and Detectives Reynolds/Sheeley of the Kingston Police Department, to conduct a search of the above described computer.

*Id.*

When Schatzel asked for permission to retrieve the computer, he

6

also asked whether there was anything on it that would hurt O'Brien.  After first responding "no," O'Brien then told Schatzel that there was a single photograph of a thirteen or fourteen-year-old naked girl that had been e-mailed to him by a chat room acquaintance.  O'Brien told Schatzel that he had ceased further communications with the acquaintance once he received the photograph.  Schatzel asked whether that was all that was on the computer, and O'Brien responded, "yes."  Based on this conversation, Schatzel reasonably believed that the photograph was still on O'Brien's computer.  Although Schatzel did not tell O'Brien why he wanted to see the computer, his purpose was to locate evidence of inappropriate behavior between O'Brien and the students and to retrieve the image of the naked girl.

The station house conversation lasted approximately two hours.  It was entirely cordial; O'Brien was cooperative; and both men behaved professionally.  At various times during the conversation, O'Brien used the bathroom and retrieved food and drink from vending machines.  Since the office was located in a non-public, secure area, he was escorted when he did so.  The escort was necessary because he needed directions and because the office was located in a non-public, secure area.  Security was

essential because confidential investigative materials were located throughout the area.  O'Brien was never *Mirandized*.

Questioning did not consume the entire two hours.  In addition to the food and bathroom breaks, Schatzel periodically left the room to advise his supervisors about O'Brien's disclosures and his consent to search.  O'Brien never asked to terminate the interview or leave, Schatzel never told him he had to stay, and O'Brien was not formally arrested.  Schatzel never threatened O'Brien or promised him anything, nor did he ever raise his voice or make any threatening gestures.  O'Brien never requested an attorney.

When testifying about the conversation in State court, O'Brien added that he spoke to his father by telephone and told him not to worry because he would be home soon.  He also testified that he read the consent to search form, discussed it with Schatzel, and subjectively felt that he had no choice but to sign the form because Schatzel told him he would get a warrant if he refused.  However, he admitted that Schatzel never actually told him he had no choice.  In his affidavit, O'Brien asserted that he was intimidated by the police and felt that he was not free to leave the station until he told them what they wanted to hear.  *See Aff. at ¶ 6; Dkt. No. 18.*

8

The court discredits O'Brien's assertions to the extent that they contradict Schatzel's sworn testimony.

From the initial point of contact through the conclusion of the station interview, the entire conversation between Schatzel and O'Brien is designated "Statement One."

After the interview, Schatzel privately told Sheeley about the photograph of the naked teen.  Schatzel's supervisor dispatched a police officer to O'Brien's home to prevent O'Brien's parents - co-occupants - from tampering with the computer until the police arrived.  Schatzel was an experienced police officer who had submitted sworn affidavits in support of, obtained, and executed over one hundred search warrants.  The court credits his testimony that had O'Brien refused consent, he would have sought a warrant.

After the interview, Schatzel and Sheeley drove O'Brien home in Sheeley's unmarked vehicle.  Sheeley was dressed in civilian clothes.  O'Brien was not handcuffed during the trip nor otherwise restrained, and he was not formally under arrest.  Schatzel wanted O'Brien present at the house so that O'Brien could modify his consent if he wished.

During the ten minute trip, O'Brien spontaneously initiated a

conversation with Schatzel.  He asked Schatzel whether he was going to be arrested because of the photograph of the under-aged naked girl on his computer.  Schatzel responded that he did not intend to arrest him given O'Brien's explanation concerning the picture's erroneous transmission by e-mail.  During that conversation, O'Brien altered his original statement, admitting that there were a "few" photographs of the under-aged girl on his computer.  He did not specify a particular computer that contained the illicit pictures.  Regardless, it was Sheeley's understanding that the photographs were still on a computer.  In retrospect, O'Brien was obviously concerned about the photographs discovered later during a forensic investigation, but he did not broach that subject.  O'Brien's car statement is designated "Statement Two."

When they arrived at the house, Sheeley parked his vehicle in the garage in order to accommodate O'Brien's father's expressed desire to avoid neighborhood embarrassment.  Once inside the home, Detectives Schatzel, Sheeley and Reynolds were lead by O'Brien and his father to a first floor bedroom.

The bedroom was approximately 12' by 14', and contained normal bedroom furniture and a desk-type arrangement ("desk") along a wall at the

foot of the bed.  Schatzel saw two computers on the desk, approximately one to two feet apart.  O'Brien identified a white computer as the Comp he and Schatzel had discussed.  The Comp was attached to computer peripherals, including a keyboard, mouse and monitor.  The other computer was a black Gateway.  Schatzel saw wires attached to the Gateway, but he could not discern whether anything was connected to the wires.  There were CD's and discs laying on the desktop next to the Comp.    When Schatzel first saw the Gateway, he was surprised because O'Brien had not mentioned a second computer during their earlier conversation.  He immediately asked O'Brien about it, and O'Brien explained that it was "his dead brother's computer."  It was reasonable for Schatzel to infer from that statement that O'Brien intended to disclaim ownership, and O'Brien neither said nor did anything further at the house to dispel that inference.  Schatzel then asked whether he could also take the Gateway, and O'Brien told him that he could.  The court credits Schatzel's assertion that had O'Brien declined consent, he would have instructed the uniform officer to remain posted to prevent tampering with the Gateway while he sought a search warrant.

Thereafter, O'Brien asked to disassemble the computers so that it

would be done properly, and he began doing so.  Schatzel began to gather

the disassembled items, and O'Brien assisted.

Meanwhile, Sheeley began gathering the CD's and discs on the

desktop and looking in desk drawers.  In the drawers, he saw additional

CD's, discs, and notes and cards that appeared to be from M.D. and other

Kingston High School students.  Not having read the consent to search,

Sheeley believed that it covered computer manuals, discs and CD's likely

located in the drawers.  Accordingly, he retrieved items from the drawers

and placed them on the desk where they were commingled with other

items.  He then returned to a drawer and located a manilla envelope which

appeared to contain materials related to students.  As he began to look in

the envelope, both O'Brien and his father protested.  Sheeley then put the

manilla envelope and its contents back in the drawer.  O'Brien told the

officers that they had gathered what they came for, and instructed them to

take what they had gathered and leave.  The officers immediately

terminated their search.  O'Brien never protested the seizure of the Comp,

the Gateway, or any of the other items gathered on the desk.

When the search concluded, the police carried the seized items to

their car, and O'Brien assisted by carrying the Gateway.  The officers

returned to the Kingston Police Department, and O'Brien and his father

followed in the father's car.  At the station, Schatzel prepared a receipt for

the property, provided a copy to O'Brien, and O'Brien and his father left.

*See Gov't Ex. B*; *Dkt. No. 19*.  This seizure is designated "Search One."  As

to Search One, the government failed to prove which of the non-computer

items were in plain view on the desktop and which were removed from the

drawers and commingled with other desktop items.

    As it relates to Search One, O'Brien's state court testimony

significantly differed from the suppression hearing testimony of Schatzel

and Sheeley.  To the extent the versions differ, the court discredits O'Brien.

O'Brien's collective statements at the house are designated  "Statement

Three."

    On May 5, the following day, Sheeley assumed investigative

responsibility and prepared an affidavit in support of a search warrant for

O'Brien's bedroom.  *See Sheeley Aff.; Dkt. No. 19, Ex. B*.  To his affidavit,

he attached S.S.'s letter and some of the notes and correspondence from

M.D. seized the preceding evening.  In addition, Sheeley informed the court

that S.S. talked to Stoutenberg when she hand-delivered the letter to him.

In that conversation, she told Stoutenberg that, while talking to O'Brien

13

online and on the telephone while O'Brien was at his residence, O'Brien told her that he was masturbating.  O'Brien asked her to do the same so that he could listen.  Sheeley further informed the court of O'Brien's admission that he had nude and pornographic pictures of a fourteen or fifteen-year-old female downloaded on his computer, and that he was having online conversations with the female.  When Sheeley presented the application, he verbally supplemented it before the court authorized the warrant.  Sheeley told the Judge that he and others had conducted a consent search the preceding evening, that he had been instructed by O'Brien to terminate the search, and that he had left notes, discs and other items behind.

On the basis of Sheeley's affidavit and attachments and his supplemental disclosures, Ulster Town Judge O'Sullivan authorized the search warrant.  Both the affidavit and warrant referenced New York Penal Law §§ 260.10 and 263.16, and the warrant authorized a search for evidence of those crimes, including the following:  correspondence, notes, letters, cards, photographs, and personal video or audio recordings or documentation regarding communications with under-aged students or persons; personal computers and hardware or software; and nude or

pornographic pictures of females who appear to be under the age of
seventeen.

In New York, one commits the crime of endangering the welfare of a
minor if he knowingly acts in a manner likely to be injurious to the mental or
moral welfare of a child less than seventeen.  *See* N.Y. PENAL LAW §
260.10(1); *12/20/06 Hearing Gov. Ex. 14*.  One commits the crime of
possessing a sexual performance of a child if he knowingly possesses a
photograph of a child less than sixteen which contains a lewd exhibition of
the child's genitals.  *See* N.Y. PENAL LAW §§ 263.00, 263.16; *12/20/06
Hearing Gov. Ex. 15*.

After Judge O'Sullivan authorized the warrant, Sheeley and others
executed it.  During the search, they seized, *inter alia*, computer discs,
video and cassette tapes, various notes and writings, and several computer
drives.  *See Gov. Inventory; 12/20/06 Hearing Gov. Ex. 5*.  The May 5
search is designated "Search Two."

After consulting with an Assistant District Attorney and in anticipation
of a forensic examination of the computers and other items, Sheeley
applied for a second search warrant on May 9, 2001.  *See 12/20/06
Hearing Gov. Ex. 6*.  Judge O'Sullivan again authorized the search and

15

forensic examination.  The May 9 warrant is designated "Search Three."

More than two months later on July 12, 2001, Sheeley interviewed O'Brien in the presence of O'Brien's attorney, Daniel Gaffney, O'Brien's father, and Detective Reynolds.  The interview was prearranged with Gaffney and occurred in the Detective Division at the Ulster Police Department.  O'Brien had not been formally arrested.  The interview began at 4:54 P.M., and it lasted less than an hour.  O'Brien was not handcuffed; Sheeley was dressed in civilian clothing; and O'Brien was entirely cooperative.

During the interview, O'Brien admitted that the computers retrieved from the bedroom were his, that his brother had used the Gateway before his death, and that O'Brien used it thereafter except for one nondescript occasion.  O'Brien also admitted ownership of the other items seized from his bedroom, including the zip drive from the Gateway.  At no time did O'Brien ever state that his earlier consent to search was ineffective or involuntary.  The July 12 conversation is designated "Statement Four."

On August 16, O'Brien was arrested.  On March 28, 2003, he plead guilty in Ulster County Court to three counts of promoting an obscene sexual performance of a child, twelve counts of promoting a sexual

16

performance by a child, and one count of obscenity in the third degree.  He was sentenced to six months incarceration, and probation.

Before his plea, O'Brien moved to suppress the Gateway, and the State court, in part, denied the motion.  O'Brien preserved his right to appeal, and an appellate court subsequently reversed, and suppressed the evidence contained on the Gateway.  Thereafter, federal authorities assumed prosecution of O'Brien.  On May 3, 2006, he was indicted.

During the federal suppression hearing, O'Brien withdrew his motion to suppress the Comp, conceding that his consent was uncoerced and voluntary.  The court also permitted late disclosure of Statement Two pursuant to Rule 16(c), and O'Brien conceded that he was not prejudiced by the late disclosure.  *See* FED. R. CR. PROC. 16(d)(2)(C) & (D).

## III.  **Summary of Suppression Issues and Legal Theories**

O'Brien argues that his statements must be suppressed because: (1) Statements One and Two resulted from custodial interrogation in the absence of *Miranda* warnings, and they were involuntary; (2) Statement Two was tainted by the unconstitutionality of Statement One;[1] and (3)

---

[1]As to Statement Two, O'Brien failed to articulate a basis for suppression in his Reply, *see Dkt. No. 20*, but stated during the hearing that he intended to rely on the same theories argued as a basis to suppress Statement One.

Statement Four was tainted by the unconstitutionality of Statements One

and Two and the searches.  He has not moved to suppress Statement

Three, and it is therefore admissible.

Regarding Search One, O'Brien argues that all items seized are

inadmissible because their seizure was tainted by Statements One and

Two.  Because he now concedes that his consent to seize the Comp was

voluntary, he alternatively argues that the seizure of all other items must be

suppressed because the search exceeded its authorized scope.  As to the

Gateway, he argues that he has standing to contest its seizure because he

had a reasonable expectation of privacy in it.[2]  He seeks to suppress

evidence seized during Searches Two and Three because each was

tainted by the illegality of Search One and Statements One and Two.  He

challenges no other aspect of Searches Two and Three and has waived

any arguments in that regard.  *See Miller*, 382 F. Supp. 2d at 364-65.

As to Statement One, the government concedes interrogation in the

absence of *Miranda* warnings.  However, it argues that O'Brien was not in

custody and the statement was otherwise voluntary.  As for Statement

---

[2]As the court has previously observed, "standing" is an archaic term, but favored euphemisms are hard to kill.  *See Miller*, 382 F. Supp. 2d at 360 n.5 & 380.  Once again, the court declines to issue a death certificate and uses the term in this opinion.

Two, it argues that *Miranda* compliance was unnecessary because there was neither custody nor interrogation and the Statement was otherwise voluntary.  As for Statement Four, it argues that it was untainted by prior police interrogation or searches, and regardless, any taint was dissipated.

As for Search One, the government alternatively argues that O'Brien has no standing to contest the Gateway's seizure, that O'Brien consented, that the Gateway and other items were in plain view, and that all items would have been inevitably seized pursuant to the execution of valid search warrants.  As for items seized during Searches Two and Three, the government argues that they were not tainted by the earlier search or statements, that the underlying search warrants were supported by probable cause independent of any reference to items seized during Search One, and that regardless, the officers were entitled to rely in good faith on the subsequent warrants.  *See Gov. Resp., Dkt. No. 19*; *Gov. Supp. Resp.*, *Dkt. No. 23*.

## IV.  Legal Principles

### A.  Burden of Production and Proof and Choice of Law

O'Brien alleges that: (1) Statements One, Two and Four were the by-product of duress and custodial interrogation in the absence of *Miranda*, or

they are tainted; and (2) Search One was conducted in the absence of a search warrant.  As such, O'Brien has satisfied his burden of production.  *See Miller*, 382 F. Supp. 2d at 361-362.  He retains the burden of proving by a preponderance of the evidence that he had a reasonable expectation of privacy in the Gateway.  *See id.*  Since O'Brien has satisfied his burden of production, the government must prove by a preponderance of the evidence that there was no custodial interrogation implicating *Miranda*, that the statements were voluntary and untainted, and that the search warrants or exceptions to the Fourth Amendment warrant requirement support admission of the evidence seized.

Although the statements and searches occurred during a State investigation, federal law applies.  *See id.* at 364.

### B.  The Statements: *Miranda* and Voluntariness

*Miranda* compliance and the voluntariness of confessions implicate the Fifth Amendment's Self-Incrimination and Due Process Clauses, respectively, and are distinct inquiries.  *See U.S. v. McFarland*, 424 F. Supp. 2d 427, 433-37 (N.D.N.Y. 2006).  "Once in custody, a suspect may not be interrogated unless he is advised of his *Miranda* rights, he demonstrates that he understands them, and he waives them, either

explicitly or implicitly....*Miranda* applies only if two preconditions exist;

namely, custody and interrogation....Absent either, non-M*irandized*

statements are admissible. ”  *U.S. v. Tudoran*, 476 F. Supp. 2d 205, 209-10

(N.D.N.Y. 2007) (internal citations omitted).

Interrogation requires express questioning or its functional

equivalent, and includes:

> any words or actions on the part of the police (other
> than those normally attendant to arrest and
> custody) that the police should know are reasonably
> likely to elicit an incriminating response from the
> suspect....A practice that the police should know is
> reasonably likely to evoke an incriminating
> response from a suspect thus amounts to
> interrogation.  But since the police surely cannot be
> held accountable for the unforeseeable results of
> their words or actions, the definition of interrogation
> can extend only to words or actions on the part of
> police officers that they *should have known* were
> reasonably likely to elicit an incriminating response.

*R.I. v. Innis*, 446 U.S. 291, 300-02 (1980) (emphasis in the original).  The

questions “must have been both likely to elicit an incriminating response

and to produce psychological pressures that will subject the individual to

the ‘will’ of the examiner.”  *U.S. v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987).

The Fifth Amendment does not prohibit the use of volunteered or

spontaneous statements at trial.  S*ee  Miller*, 382 F. Supp. 2d at 370 (citing

21

*Edwards v. Ariz.*, 451 U.S. 477, 485-86 (1981)).

Custody is determined by objectively reviewing all circumstances and evaluating whether a reasonable person would have felt at liberty to terminate an interrogation and leave.  Said otherwise, the issue is "whether a reasonable person would have understood [him]self to be subjected to" arrest-like restraints, and it "focuses on the presence or absence of affirmative indications that he was not free to leave."  *Tudoran*, 476 F. Supp. 2d at 210 (citing *U.S. v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004)); *see also Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004).  Relevant factors "include: the place of interrogation;...whether a suspect voluntarily appeared; whether he was threatened with arrest or told he was free to leave; whether he was allowed to leave after the questioning; and the existence of arrest-like restraints such as handcuffs, drawn weapons or other physical restrictions."  *U.S. v. Sharifipour*, 1:05-CR-427, 2006 WL 1007661, at *6 (N.D.N.Y. Apr. 17, 2006) (citations omitted).

To determine whether a statement is uncoerced and voluntary within the ambit of the Due Process Clause, a court must objectively assess the totality of the circumstances surrounding the interaction between the suspect and the police, including the police conduct, the conditions of

interrogation, and the suspect's characteristics.  *See id.* at 7.  Relevant

factors include physical or psychological abuse; threats; material

misrepresentations; affirmative acts of trickery or deceit; whether *Miranda*

warnings were provided (as necessary or not); the place of interrogation

and its duration and conditions; the attitude of the police when conducting

the interrogation; the presence of counsel; and the accused's background,

age, education, intelligence, physical and mental state, and experience.

*See id.* at 6-8.  While *Miranda* advice, if given, is a relevant factor, the

failure to *Mirandize* does not alone demonstrate coercion.  *See McFarland*,

424 F. Supp. 2d at 434 & n.4 (citing *Dickerson v. U.S.*, 530 U.S. 428, 444

(2000); *Harris v. N.Y.*, 401 U.S. 222, 226 (1971)).  Likewise, the presence

of counsel is relevant but not dispositive.

   When objectively evaluating the voluntariness of a police-citizen

encounter or a statement, the subjective intentions of the police and the

subjective motivations of the suspect are irrelevant.  *See, e.g.*, *Yarborough*,

541 U.S. at 663; *Newton*, 369 F.3d at 663; *Tudoran*, 476 F. Supp. 2d at

215-16; *Sharifipour*, 2006 WL 1007661 at *6; *Miller*, 382 F. Supp. 2d at

373.  Thus, the circumstances must be evaluated from the perspective of a

reasonable police officer and a reasonably innocent person in the suspect's

23

shoes.  *See U.S. v. Drayton*, 536 U.S. 194, 202 (2002) (citing *Fla. v. Bostick*, 501 U.S. 429, 437-38 (1991)).

## C. <u>Standing</u>

In order to contest a search, a defendant must prove by a preponderance of the evidence that he has standing to complain that his privacy rights were violated.  *See U.S. v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980); *Miller*, 382 F. Supp. 2d at 379.  Standing can be conceptually difficult, and courts have struggled with the concept since the Supreme Court's decision in *Katz v. U.S.*, 389 U.S. 347 (1967).  *See, e.g.,* 1 W. LaFave, Search and Seizure § 2.1(b), p. 435 (4th ed. 2004).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  It protects the right of private citizens to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy.  *See Kyllo v. U.S.*, 533 U.S. 27, 33-34 (2001); *Newton*, 369 F.3d at 664.  There is no Fourth Amendment infringement if official conduct does not compromise any legitimate interest in privacy.  *See Ill. v. Caballes*, 543 U.S. 405, 407 (2005).

As the Supreme Court has held, a "Fourth Amendment search does *not* occur - even when the explicitly protected location of a *house* is concerned - unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" *Kyllo*, 533 U.S. at 32-33 (quoting *Cal. v. Ciraolo*, 476 U.S. 207, 211 (1986)).  The court now concludes, and the State appellate court previously observed, *see O'Brien*, 2 A.D.3d at 1224, that modern society certainly recognizes a reasonable expectation of privacy in personal home computers.  However, that conclusion does not end the inquiry.  Indeed, a suspect must still prove that he manifested a subjective expectation of privacy in the computer under consideration.  This is so because expectations of privacy may vary as to items in the same space invaded.  *See U.S. v. Haqq*, 278 F.3d 44, 50 (2d Cir. 2002); *Miller*, 382 F. Supp. 2d at 380.

When assessing whether police reasonably seized a disclaimed item, the critical issue is whether a suspect took action to protect his privacy interest at the time of the seizure, not whether he expressed a contrary position at some later time.  *See Gudema v. Nassau County*, 163 F.3d 717, 722 (2d Cir. 1998).  Ownership disclaimers and abandonment are often

treated identically, and most Circuits have concluded that the former reflects a subjective intention to relinquish an expectation of privacy.  *See U.S. v. Welbeck*, 145 F.3d 493 (2d Cir. 1998); *U.S. v. Fulani*, 368 F.3d 351 (3d Cir. 2004); *U.S. v. Burbage*, 365 F.3d 1174 (10th Cir. 2004); *U.S. v. Sanders*, 196 F.3d 910 (8th Cir. 1999); *U.S. v. McDonald*, 100 F.3d 1320 (7th Cir. 1996); *U.S. v. Hernandez*, 7 F.3d 944 (10th Cir. 1993); *U.S. v. Alvarez*, 6 F.3d 287 (5th Cir. 1993); *U.S. v. De Los Santos Ferrer*, 999 F.2d 7 (1st Cir. 1993); *U.S. v. Gonzalez*, 979 F.2d 711 (9th Cir. 1992); *U.S. v. Frazier*, 936 F.2d 262 (6th Cir. 1991); *U.S. v. Lewis*, 921 F.2d 1294 (D.C. Cir. 1990); *U.S. v. Clark*, 891 F.2d 501 (4th Cir. 1989); *U.S. v. McBean*, 861 F.2d 1570 (11th Cir. 1988); *U.S. v. Colbert*, 474 F.2d 174 (5th Cir. 1973).  It is irrelevant that the police disbelieve ownership disclaimers or know that the defendant is lying.  *See, e.g., Sanders*,196 F.3d at 914; *Gonzalez,* 979 F.2d at 714.

### D.  <u>Consent</u>

A warrantless search is reasonable if it is based on voluntary consent given by one authorized to do so.  *See Fla. v. Jimeno*, 500 U.S. 248, 250-51 (1991) (citing *Katz*, 389 U.S. at 360; *Ill. v. Rodriguez*, 497 U.S. 177 (1990); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)).

26

"Voluntariness is a question of fact determined by a 'totality of the circumstances.'"  *U.S. v. Isiofia*, 370 F.3d 226, 231 (2d Cir. 2004) (quoting *Schneckloth*, 412 U.S. at 227).  The government must prove by a preponderance of the evidence that he who consented made a free and unconstrained choice and did not simply acquiescence to a show of authority.  Consent is involuntary if it is exacted from explicit or implicit coercion caused by implied threat or covert force.  *See U.S. v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006) (citing *Schneckloth*, 412 U.S. at 228; *Isiofia*, 370 F.3d at 230; *U.S. v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993)); *see also U.S. v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir. 1988) (free and unconstrained choice).  The ultimate question is whether the police had a reasonable basis to believe that the person consented to the search.  *See Isofia*, 370 F.3d at 231.  The existence of probable cause is irrelevant to searches or seizures based on consent.  *See Schneckloth*, 412 U.S. at 227.

Another aspect of consent analysis is whether the police complied with the scope of the authorization given.  Scope refers to consensual parameters and may include limitations regarding time, duration, area and intensity.  Like voluntariness, scope is a question of fact based upon the

totality of the circumstances, and the government must prove that a search and seizure was within the scope of the authorization given. *See U.S. v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005).  The standard for measuring scope is "'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251 (citations omitted).  Although scope is most often defined by the object of the search, a person may place other limits on the scope of his consent.  *See id.*; *see also U.S. v. Snow*, 44 F.3d 133, 135 (2d Cir. 1995).

When assessing both the voluntariness and scope of consensual searches, courts have examined various relevant factors, including: (1) whether the police made a show of force or engaged in similar coercive conduct; *see Drayton*, 536 U.S. at 204 (use of force or overwhelming show of force, intimidating movements, brandishing of weapons, blocking of exits, threats, commands or authoritative tone of voice, and show of badge); *Bumper v. N.C.*, 391 U.S. 543, 549-50 (1968) (voluntary consent negated by an unauthorized home entry on the claimed authority of a search warrant); *U.S. v. Baro*, 15 F.3d 563, 567 n.1 (6th Cir. 1994) (impermissible seizure of property preceding consent)*; U.S. v. Oguns*, 921

F.2d 442, 448 (2d Cir. 1990) (impermissible home entry and seizure of evidence before consent); *U.S. v. Tortorello*, 533 F.2d 809, 815 (2d Cir. 1976) (same); *U.S. v. Faruolo*, 506 F.2d 490, 493 (2d Cir. 1974) (improper threats to arrest family); (2) whether the police advised a suspect of his right to refuse consent (although not constitutionally mandated); *see Drayton*, 536 U.S. at 206; *Ohio v. Robinette*, 519 U.S. 33 (1996); *U.S. v. Mendenhall*, 446 U.S. 544, 558-59 (1980); *U.S. v. Yu-Leung*, 51 F.3d 1116, 1119 (2d Cir. 1995); *U.S. v. Price*, 599 F.2d 494, 503 n.11 (2d Cir. 1979); (3) threats to seek or obtain a search warrant; *see U.S. v. Tutino*, 883 F.2d 1125, 1137 (2d Cir. 1989); *Faruolo*, 506 F.2d at 494; (4) the location where consent was obtained; *see Mendenhall*, 446 U.S. at 559; *U.S. v. Boone*, 245 F.3d 352, 363 (4th Cir. 2001) (public parking lot); *Arango-Correa*, 851 F.2d at 57 (custodial confinement in a police station); (5) a defendant's maturity, sophistication, physical and mental health, and emotional state; *see U.S. v. Smith*, 260 F.3d 922, 924 (8th Cir. 2001) (age, intelligence, education, whether influenced by drugs or alcohol, whether he understood his rights); *U.S. v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983) (age, literacy, demeanor, prior legal experience); *Price*, 599 F.2d at 503 (age, maturity, education, intelligence, experience); and (6) a defendant's

29

objections, affirmative acts, or statements of acquiescence (although

silence alone does not constitute consent); *see Gandia*, 424 F.3d at 265

(citing *U.S. v. Moran Vargas*, 376 F.3d 112, 113-14 (2d Cir. 2004)).

The defendant's conduct includes whether he adopted a cooperative

posture with the police in order to divert suspicion or for some other

reason.  *See Boone*, 245 F.3d at 363; *Price*, 599 F.2d at 503 n.11.  Thus,

the fact that a defendant actually helped with a search and seizure is

relevant.  *See U.S. v. Pineiro*, 389 F.3d 1359, 1366 (11th Cir. 2005); *U.S.

v. Bethea*, 598 F.2d 331, 336 (4th Cir. 1979); *U.S. v. Bryant*, 370 F. Supp.

452, 455 (W.D.Pa. 1974).  In fact, such a cooperative posture is relevant in

cases involving ambiguous consent.  *See U.S. v. Kohn*, 365 F. Supp. 1031,

1034 (E.D.N.Y. 1973) (words and actions indicative of consent).  However,

non-resistance is not synonymous with cooperation and is not a factor

demonstrating consent.  *See U.S. v. Jaras*, 86 F.3d 383, 390 (5th Cir.

1996).  And, simple acquiescence to matter-of-fact police declarations does

not reflect voluntary consent.  *See U.S. v. Baro*, 15 F.3d 563, 567 (6th Cir.

1994).  If a defendant later withdraws consent, the withdrawal is relevant to

whether he earlier understood his right to withhold it.  *See Boone*, 245 F.3d

at 362; *U.S. v. Dickerson*, 975 F.2d 1245, 1249 (7th Cir. 1992).  If consent

is voluntary, it makes no difference that it reflects a decision adverse to the suspect's self-interests.  *Cf. Mendenhall*, 446 U.S. at 555-56 ("It may happen that a person makes statements to law enforcement that he later regrets, but the issue in such cases is not whether the statement was self-protective, but rather whether it was made voluntarily."); *U.S. v. Gorman*, 355 F.2d 151, 158-59 (2d Cir. 1965).  Ultimately, all circumstances must be evaluated, and no single factor controls.  *Cf. U.S. v. Bye*, 919 F.2d 6, 9 (2d Cir. 1990) (voluntariness of a *Miranda* waiver).  Police conduct is not coercive if a reasonable person would feel free to decline an officer's request, terminate the encounter, and refuse consent.  *See Drayton*, 536 U.S. at 204.

### E.  <u>Plain View</u>

In the absence of a search warrant, it is reasonable for the police to seize evidence in plain view if three conditions are met: (1) the officer must lawfully occupy the space where the object to be seized may be plainly seen; (2) the incriminating nature of the object must be readily apparent; and (3) the officer must have lawful access to the object itself.  *See Minn. v. Dickerson*, 508 U.S. 366, 375 (1993); *U.S. v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 81 & 82 n.11 (2d Cir. 2002); *U.S. v. Reyes*,

283 F.3d 446, 468 (2d Cir. 2002); *see also Miller*, 382 F. Supp. 2d at 378-79 (citing *Horton v. Cal.*, 496 U.S. 128 (1990); *Coolidge v. N.H.*, 403 U.S. 443 (1971)).

As Justice Stevens explained in *Horton*, the lawful access element is essentially the corollary of the first element.  *See Horton*, 496 U.S. at 137 n.7.  In other words, although a police officer might legitimately be in a position to plainly see evidence, he must still have a legitimate basis under the Fourth Amendment to approach or enter where the evidence is located and seize it.  *See id.*

The requirement that the incriminating nature of the object must be readily apparent means that the police must possess probable cause to believe that the object is evidence of a crime or contraband.  *See Soldal v. Cook County, Ill.*, 506 U.S. 56, 66 (1992) (citing *Ariz. v. Hicks*, 480 U.S. 321, 326-27 (1987)).  A reasonable suspicion will not suffice.  *See Hicks*, 480 U.S. at 326.  Readily apparent also means that the police may not first search or seize an object without some constitutional basis to do so, and then seek to determine whether there is probable cause to believe the object is evidence or contraband.  *See Minn. v. Dickerson*, 508 U.S. at 376.

Although probable cause is a familiar Fourth Amendment concept, its application in the plain view arena is not always obvious.  Analytically, the focus is the factual nexus between the object and criminal conduct.  For example, if the police see white powder in plain view during the execution of an assault warrant, but know the suspect was recently arrested on drug charges, there is probable cause to seize the powder.  *See, e.g., U.S. v. Buchanan*, 70 F.3d 818, 826 (5th Cir. 1995).  On the other hand, absent a factual basis to suspect drug activity or some independent sensory means to identify the substance as contraband, probable cause to seize would not exist.

As it relates to searches, probable cause is defined as follows.

> [P]robable cause is a fluid concept - turning on the assessment of probabilities in particular factual contexts....Its focus is on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act....Thus, probable cause exists where the facts and circumstances within...the officers' knowledge and of which they had reasonably trustworthy information [are] [sic] sufficient in themselves to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched....The standard does not demand certainty but only a fair probability that contraband or evidence of a crime will be found....Further, courts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and

circumstances where a layman might not.

*U.S. v. Gaskin*, 364 F.3d 438, 456-57 (2d Cir. 2004) (internal quotation marks and citations omitted).  The circumstances must be viewed from the perspective of a "reasonable and cautious police officer at the scene, guided by his experience and training."  *Id.* at 457 (citing *Price*, 599 F.2d at 501).  Examination of the facts from a police officer's perspective applies to each element of the plain view doctrine, including the evidentiary significance of an item.  *See U.S. v. Moreno*, 897 F.2d 26, 32-33 (2d Cir. 1990).

In the context of a computer search, the Circuit has cautioned that probable cause is not a legal determination of guilt or liability.  *See U.S. v. Martin*, 426 F.3d 68, 76 (2d Cir. 2005), *rehearing denied*, 426 F.3d 83 (2d Cir. 2005), *rehearing denied en banc*, 430 F.3d 73 (2d Cir. 2005), *and cert. denied*, 126 S.Ct. 2861 (2006).  It is a relaxed standard, and it is not synonymous with a *prima facie* showing that a particular crime was committed.  *See id.*  Moreover, it does not require proof by a preponderance of the evidence or beyond a reasonable doubt.  *See id.*  Instead, the probable cause analysis asks whether something more than a mere suspicion - namely, a reasonable probability - supports the

conclusion that evidence of a crime will be found on a computer.  *See id.*

### F. <u>Search Warrants</u>

Search warrant requirements emanate from the language of the

Fourth Amendment which provides, in part, that "no Warrants shall issue,

but upon probable cause, supported by Oath or affirmation, and particularly

describing the place to be searched, and the persons or things to be

seized."  U.S. CONST. amend. IV.

A search warrant must satisfy four basic requirements in order to

pass constitutional muster.  First, it must be issued by a neutral and

detached judge.  *See Coolidge*, 403 U.S. at 449-53.  Second, it must be

supported by an oath or affirmation.  *See U.S. v. Turner*, 558 F.2d 46, 50

(2d Cir. 1977).  Third, it must describe with particularity the place to be

searched and the persons or things to be seized.  *See Steele v. U.S.*, 267

U.S. 498, 503 (1925).  Fourth, the oath or affirmation must establish

probable cause to believe that the persons or things to be seized will be

found in the place to be searched.  *See Brinegar v. U.S.*, 338 U.S. 160, 164

n.4 (1949); *Carroll v. U.S.*, 267 U.S. 132, 162 (1925).

By judicial policy, police are encouraged to obtain search warrants,

and courts should employ common sense rather than stringent and hyper-

technical standards when evaluating probable cause.  *See U.S. v. Ventresca*, 380 U.S. 102, 108 (1965); *U.S. v. Martin*, 157 F.3d 46, 52 (2d Cir. 1998).[3]  So too, reviewing courts should pay substantial deference to the probable cause determination made by a neutral judge issuing the warrant.  *See Aguilar v. Tex.*, 378 U.S. 108, 111 (1964), *abrogated on other grounds by Ill. v. Gates*, 462 U.S. 213 (1983); *Martin*, 157 F.3d at 52.  In fact, the probable cause determination is satisfied when the issuing judge "had a substantial basis for finding probable cause."  *U.S. v. Singh*, 390 F.3d 168, 181 (2d Cir. 2004) (citation omitted).

Even if probable cause is lacking, suppression is not warranted if the police objectively relied in good faith on a search warrant.  *See id.* (citing *U.S. v. Leon*, 468 U.S. 897, 923 (1984)).  The good-faith doctrine applies unless: (1) the issuing judge relied on an affidavit that the affiant either knew was false, or reflected the affiant's reckless disregard for the truth; (2) the issuing judge abandoned his neutral role; (3) the affidavit so failed in its recitation of probable cause that a reasonable police officer would have recognized as much; or (4) the warrant was so facially deficient that any

---

[3]As it relates to searches, the court has already defined probable cause in the preceding subsection.  *See supra* text Part IV § E. at p. 34.

reasonable police officer would have recognized as much.  *See id.*

Particularity and probable cause also require facts demonstrating a

nexus or relationship between what is sought and the thing to be searched.

*See id.* at 182.  However, nexus "does not require direct evidence and 'may

be based on 'reasonable inference' from the facts presented based on

common sense and experience.'"  *Id.* (citations omitted).

### G. Derivative Evidence:  "Fruit of the Poisonous Tree"

Generally, tangible and testimonial evidence directly or indirectly

derived from unconstitutional police conduct must be suppressed because

it is tainted or constitutes "fruit of the poisonous tree."  *See Murray v. U.S.*,

487 U.S. 533, 536-37 (1988); *Wong Sun v. U.S.*, 371 U.S. 471, 484 (1963);

*Nardone v. U.S.*, 308 U.S. 338, 341 (1939); *see also Miller*, 382 F. Supp.

2d at 374.  The doctrine applies to both coerced confessions under the

Fifth Amendment that taint subsequent confessions or searches, and

conversely, Fourth Amendment violations that taint statements.  *See Miller*,

382 F. Supp. 2d at 374 n.12 & 375; *but see U.S. v. Patane*, 542 U.S. 630,

640 (2004) (holding that statements obtained in contravention of *Miranda's*

requirements do not taint seizures).  The critical issue is "whether, granting

establishment of the primary illegality, the evidence to which instant

37

objection is made has been come at by exploitation of that illegality or

instead by means sufficiently distinguishable to be purged of the primary

taint." *Wong Sun*, 371 U.S. at 488 (internal quotation marks and citation

omitted).

Suppression of derivative evidence is not required if taint is purged or

dissipated in one of two ways: the evidence has an independent source; or,

the causal link between the illegal conduct and the evidence is attenuated.

*See id*. at 487; *Murray*, 487 U.S. at 536-37.  The government must prove

dissipation by a preponderance of the evidence.  *See Brown v. Ill.*, 422

U.S. 590, 604 (1975).

Attenuation is not synonymous with a "but for" test, but instead

focuses on exploitation of the primary illegality to generate the derivative

evidence.  *See id.* at 599, 603.  The purpose of suppression is to deter

lawless police conduct and preserve the integrity of judicial proceedings.

*See id.*  If attenuation factors blunt that purpose, suppression is

unwarranted.  *See Murray*, 487 U.S. at 537.

As for confessions, there are no rigid rules determining admissibility,

such as the passage of time or a break in the chain of events.  *See Miller*,

382 F. Supp. 2d at 374.  Instead, the issue is whether a defendant's

decision to speak is voluntary.  *See id.*  Thus, where a defendant was

unlawfully arrested, released, and voluntarily confessed several days later,

the taint of the arrest was attenuated, and the statement was admissible.

*See Wong Sun*, 371 U.S. at 491.

If police seize evidence pursuant to a valid search warrant obtained

on the basis of information unconnected to an earlier Fourth Amendment

violation, there is an independent source for the seizure, and the evidence

is untainted and admissible.  *See Murray*, 487 U.S. at 540-41.  Even if the

police obtain knowledge during a Fourth Amendment violation, suppression

is unwarranted if they would have obtained the same knowledge when

executing a valid and independent warrant.  *See id.* at 541-42.  There are

two prerequisites to the *Murray* rule: "(1) the warrant must be supported by

probable cause derived from sources independent of the illegal [conduct];

and (2) the decision to seek the warrant may not be prompted by

information gleaned from the illegal conduct."  *U.S. v. D.K. Johnson*, 994

F.2d 980, 987 (2d Cir. 1993); *see also U.S. v. Canfield*, 212 F.3d 713, 717-

18 (2d Cir. 2000).

Good faith reliance on a search warrant is also a pertinent factor.

*See Leon*, 468 U.S. at 922; *U.S. v. Reilly*, 76 F.3d 1271, 1273 (2d Cir.

39

1996).  Thus, evidence is admissible where the police act with objective

good faith on a search warrant issued by a neutral judge, even if the

warrant was mistakenly issued.  *See Reilly*, 76 F.3d at 1273.  The good

faith exception is unavailable, however, if the police fail to disclose relevant

details of their underlying conduct to the judge.  *See id.* at 1280-81.

Consent to search may provide an independent justification for a

seizure, and depending on the circumstances of consent, the taint of a

Fourth Amendment violation may be dissipated.  *See Snype*, 441 F.3d at

132; *Oguns*, 921 F.2d at 447-48.  The government must prove that a

defendant's consent was sufficiently an act of free will to purge the taint.

*See Snype*, 441 F.3d at 134.  Relevant factors in the analysis include

temporal proximity, constitutional warnings, intervening circumstances, and

the flagrancy of official misconduct.  *See id.*

The government may also establish an independent source if it

proves by a preponderance that evidence would have been inevitably

discovered without the constitutional violation.  *See Nix v. Williams*, 467

U.S. 431, 444 & 448 (1984); *see also Murray*, 487 U.S. at 539 (inevitable

discovery as an extrapolation of the independent source doctrine); *U.S. v.

Eng*, 971 F.2d 854, 859 (2d Cir. 1992) (same).  To conclude that evidence

40

would have been inevitably discovered, the court must view affairs as they existed at the instant before the constitutional violation and decide whether the evidence would have been lawfully discovered if the unlawful conduct had not occurred.  *See U.S. v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006).  The doctrine applies "only where there is a high level of confidence that each of the contingencies required for the discovery...would in fact have occurred." *Id.*

## VI.  Factual Analysis and Legal Conclusions

### A.  Statement One

The facts inescapably demonstrate that *Miranda* warnings were unnecessary because O'Brien was not in custody, and the statement was otherwise voluntary.

The investigation was predicated on allegations of a seventeen-year-old female which could have adversely affected O'Brien's reputation. Consequently, Schatzel intended to conduct his investigation cordially and professionally.  Indeed, in light of the circumstances, Schatzel conducted himself in a objectively reasonable manner throughout his encounter with O'Brien.

From the content of S.S.'s written and verbal disclosures - the latter

41

communicated to Schatzel by Stoutenberg - it was reasonable to conclude

that impermissible conduct occurred between O'Brien and under-aged

female students.  *See* N.Y. PENAL LAW § 260.10(1) (endangering the

welfare of a child).[4]  Although that conclusion was reasonable, Schatzel

had no incentive to arrest, and he had every reason to investigate with

sensitivity and professional decorum.  There was no better place to begin

his investigation - and possibly conclude it - than by asking O'Brien to

explain.  *See Mendenhall*, 446 U.S. at 554 ("The Court has...acknowledged

[the] need for police questioning as a tool in the effective enforcement of

the criminal laws.  Without such investigation, those who were innocent

might be falsely accused, those who were guilty might wholly escape

prosecution, and many crimes would go unsolved.  In short, the security of

all would be diminished." (internal quotation marks and citations omitted)).

Schatzel was dressed in civilian clothes; he drove an unmarked

vehicle; and he politely asked O'Brien if he would accompany him to the

police station to discuss the allegations.  There was no weapon displayed,

no handcuffs, no physical touching, and no coercive language or tone

---

[4]Despite O'Brien's contrary argument, *see O'Brien Reply Memo.; Dkt. No. 20*, the disclosures reasonably support the conclusion that impermissible conduct with S.S. and others occurred while they were sixteen or younger.

insisting on compliance.

After the initial conversation with O'Brien, no reasonable police officer would have arrested him, especially since O'Brien denied the allegations. While Schatzel's subjective intentions are irrelevant, it is objectively clear that he did not intend to arrest O'Brien, and he did nothing to suggest that O'Brien was under arrest.  In fact, O'Brien was not formally arrested until four months later.  Other than O'Brien's discredited, non-testimonial subjective feelings, there are no objective facts demonstrating that his decision to accompany Schatzel was anything other than a voluntary course of action that any rational, well-educated person, if so inclined, would have felt free to refrain from doing.

Just as there was no objective indicia of coercion inducing O'Brien to go to the station, there was no coercive conduct that either kept him there, induced him to speak, or, as he now concedes, caused him to voluntarily consent to the seizure of the Comp.  The entire conversation was cordial and occurred in an office, not an interrogation room.  While there were some restrictions on O'Brien's movement because the office was located in a secure and sensitive area, those restrictions were nothing more than an escort during forays to the vending machines and rest room.  O'Brien had

access to the telephone, and he spoke with his father.  In fact, he told his father not to worry because he would be home shortly – hardly the words of a man in custody.  Furthermore, he was not arrested, and he was home shortly.

Again, the circumstances fail to demonstrate police coercion.  There was no weapon displayed, no handcuffs, no physical abuse or psychological coercion, no threats, no material misrepresentations or affirmative acts of trickery or deceit, and no police language or tone insisting that O'Brien speak.  Given O'Brien's age, education, intelligence, and physical and mental state, there was nothing coercive in the two-hour conversation.  While the failure to *Mirandize* is relevant, that failure does not demonstrate coercion.  Any reasonably innocent person in O'Brien's shoes would have felt free to terminate the conversation and leave.

Given the totality of the circumstances, Statement One is admissible because it is objectively reasonable to conclude that O'Brien was not in custody.  Accordingly, *Miranda* warnings were not required, and the statement was voluntary.

**B.  Statement Two**

By the time Statement One ended, O'Brien's admission that he had a

nude picture of an under-aged female on his computer undoubtedly caught

Schatzel's attention - an observation corroborated by the fact that he

promptly told Sheeley about the admission.  Nonetheless, O'Brien's

admission was accompanied by a self-serving explanation as to how he

obtained the picture.  Given the results of the later forensic examination, it

is obvious that O'Brien was subjectively concerned because he knew what

was really on his computers.  However, the circumstances must be

evaluated objectively from the perspective of a reasonably innocent

person.  Thus, for all of the same reasons that O'Brien was not in custody

at the police station, he was not in custody later when two plain clothes

detectives drove him home in an unmarked car.

Specifically, there was no weapon displayed, no handcuffs, no

physical abuse or psychological coercion, no threats, no material

misrepresentations or affirmative acts of trickery or deceit, and no police

language or tone insisting that O'Brien speak.  Given O'Brien's age,

education, intelligence, and physical and mental state, there was nothing

coercive about the conversation in the car.  Any reasonably innocent

person in O'Brien's shoes would have felt free not to speak.

Furthermore, there was no interrogation.  Concerned about his earlier

disclosure regarding the minor female, O'Brien spontaneously initiated the conversation.  Accordingly, neither of the two preconditions - custody or interrogation - triggered a requirement that the police issue *Miranda* warnings.  Lastly, since there was no unconstitutional police conduct associated with Statement One, Statement Two is untainted.  Accordingly, Statement Two is admissible.

### C.  Statement Three

O'Brien does not seek suppression of Statement Three.

### D.  Search One

All items seized during Search One are admissible on the basis of varying and alternative legal theories.  To understand that conclusion, the items must be viewed in three separate categories: the Comp; the Gateway; and the desktop and desk drawer items.[5]

#### 1.  The Comp

O'Brien concedes that he voluntarily consented to the Comp's seizure, but argues that his consent was tainted by the unconstitutionality of Statement One.  Because Statement One passes constitutional muster,

---

[5]The desktop and desk drawer items may be of no evidentiary interest to either the prosecution or the defense given the charges in the indictment.  If so, neither party has asked the court to disregard them.

there is no taint and the Comp is admissible.

### 2. <u>The Gateway</u>

The Gateway is admissible because: O'Brien consented to its seizure; alternatively, the plain view doctrine justified its seizure; alternatively, O'Brien has no standing to contest its seizure; and alternatively, the computer and its contents would have been inevitably discovered through the execution of two subsequently issued search warrants free of any taint.

O'Brien gave the police untainted, voluntary authorization to enter his home and bedroom to seize the Comp.  Therefore, it was constitutionally permissible for them to be in the bedroom when they saw the Gateway and desktop items and spoke with O'Brien.[6]

At that point in time, and given S.S.'s letter, Stoutenberg's disclosures, Statements One through Three, and reasonable conclusions derived from those sources of information, it was objectively reasonable for the police to believe as follows: O'Brien used a home computer to engage in inappropriate sexual conversations with under-aged female students;

---

[6]Although the court has also concluded that Statement Two was constitutionally obtained and untainted, the statement is irrelevant to O'Brien's poisoned fruit argument because his consent preceded it.

O'Brien lied to school officials when asked about it; a home computer probably housed evidence of those conversations admissible to prove that O'Brien endangered the welfare of children; O'Brien had photographs of a naked female minor on a home computer, he originally lied about the number of such photographs, and, therefore, he may have lied concerning the circumstances by which he obtained the photographs; and a home computer still housed evidence admissible to prove that O'Brien possessed photographs depicting a sexual performance of a child.  The last inference regarding the probable content of the photographs is objectively reasonable because of O'Brien's illicit communications with female students, his description of the photographs, and his concern about his imminent arrest because he possessed the photographs.  His concern about arrest was expressed in direct response to Schatzel's question at the station regarding whether there was anything on the computer that would hurt him, and it was reemphasized by his spontaneous conversation in the car.  However, while there was probable cause to believe that evidence was located on a home computer, it is also true that before entering the home, Schatzel was aware of no computer other than the Comp.

Clearly, the written consent was limited in scope to the Comp, the

only computer mentioned by O'Brien.  However, when Schatzel entered the

bedroom, it was readily apparent that other relevant items were in plain

view.  Notably, the Gateway sat on the desk a few feet from the Comp.

Moreover, there were disks, notes and cards on the desk next to the

Gateway, and Sheeley readily observed that several of the notes related to

female students.  When Schatzel saw the Gateway, he was surprised

because its existence was relevant insofar as he was concerned, and

O'Brien had not mentioned it earlier.  Given its location and his observation

of connected wires, he had probable cause to believe that it contained

evidence of the offenses he was then investigating.  In other words, there

was probable cause to believe that a home computer contained such

evidence and O'Brien's failure to mention a second computer does not

undercut that conclusion.

Despite the existence of probable cause and although he might

reasonably have done so, Schatzel did not, however, seize the Gateway

pursuant to the plain view doctrine.  Instead, he sought permission from

O'Brien to expand the scope of the original consent.  It is objectively

reasonable to conclude that, given the verbal exchange between O'Brien

and Schatzel, O'Brien authorized Schatzel to take the Gateway.  O'Brien

was completely cooperative with the police investigation and even assisted

with disassembling the Gateway and carrying it to the police car, facts that

support the conclusion that he expanded the scope of his original written

consent to include the Gateway.  Furthermore, whether Schatzel had

probable cause to believe the Gateway contained evidence of criminal

behavior is irrelevant to consent analysis.

As further support for the conclusion that O'Brien voluntarily

expanded his original consent, the circumstances reflect that nothing had

changed in the cordial nature of the encounter between he and the police.

The police were in the home permissibly, and there was no show of force,

and no other coercive behavior or environment.  O'Brien was in his home

and in the presence of his father.  The police took every reasonable

precaution to avoid embarrassing O'Brien and his parents, including

parking the police cars out of sight in the garage.

The voluntariness of O'Brien's consent is also supported by the

reasonable and objective facts known to O'Brien.  As a professional, he

was asked to participate in an interview at the police station, he was

treated professionally and courteously during that interview, he was told he

was not under arrest, he was fully informed of his rights regarding his

consent to search, and he was driven home.  Regarding his rights, he was informed in writing, as acknowledged by his signature, that he could refuse consent, that he could consult with an attorney if he wished to, that he could withdraw his consent at any time, and that he could compel the police to seek a search warrant.  The fact that he ultimately withdrew his consent demonstrates that he understood his right to do so in the first place.  Objectively, O'Brien made a free and unconstrained choice to allow the police to take the Gateway, and he did not simply acquiesce to a show of authority.

Alternatively, the Gateway would be admissible pursuant to the plain view doctrine.  Because Schatzel was lawfully in the bedroom where he could see the Gateway and where he had lawful access to it, the only issue is whether its incriminating nature was readily apparent.  "Readily apparent" is synonymous with probable cause, and the court has already concluded that Schatzel had probable cause to believe that a home computer had evidence related to the two state charges under investigation, either of which would have supported seizure of a computer.

Furthermore, the existence of probable cause and the evidentiary significance of the Gateway must be evaluated from a reasonable police

officer's perspective.  The seizure of a computer does not depend on determinations of guilt or liability, nor proof beyond a reasonable doubt or by a preponderance of the evidence, or proof sufficient to establish a *prima facie* case.  Thus, the controlling issue is whether there was a reasonable probability that evidence of either the two state crimes was on the Gateway.  Given the proximity of the Gateway to the Comp, Schatzel's observation of wires connected to the Gateway, and the other probable cause factors already recited, it was reasonable for Schatzel to conclude that the Gateway also housed relevant evidence.  The fact that O'Brien failed to acknowledge the existence of the Gateway in earlier conversations or admit that evidence was housed in that computer does not dictate a contrary conclusion.

Alternatively, the Gateway would be admissible because O'Brien has no standing to contest its seizure.  When asked about it, O'Brien affirmatively disclaimed ownership when he lied and said that it belonged to his deceased brother.  At that time, it was reasonable for Schatzel to rely on that disclaimer.  Not until four months later did O'Brien first admit use and a possessory interest, an admission he repeated during his state court testimony.

When reversing the underlying suppression decision, the state appellate court focused on O'Brien's privacy interests in his home and bedroom, and O'Brien has adopted the same focus in this litigation.  *See O'Brien*, 2 A.D.3d at 1222; *O'Brien Memo.*, *Dkt. No. 18*.  However, O'Brien's general privacy interests in his house and bedroom are irrelevant because expectations of privacy may vary as to individual items located in the same space invaded.  *See Haqq*, 278 F.3d at 50; *Miller*, 382 F. Supp. 2d at 380.  O'Brien also argues that the court should infer that the police knew he was lying because his brother was dead.  That argument is misplaced because whether or not the police knew he was lying is irrelevant.  Instead, the question is whether the seizure was reasonable because O'Brien disavowed an expectation of privacy.  His later ownership admission is irrelevant because he took no action to protect his privacy interest when the computer was seized.  In fact, he affirmatively did the opposite.  *See Gudema*, 163 F.3d at 722.  Under the circumstances, the police seizure of the Gateway was reasonable, and O'Brien is without standing to contest its admissibility.[7]

---

[7]Again, standing is conceptually difficult and the court acknowledges other judicial opinions at odds with the conclusion reached here.  One need look no further than the underlying state court decision.  *See also O'Brien Memo. and cases cited therein*; *Dkt. No. 18*.  This court departs from the Appellate Division's analysis because it focused on O'Brien's later

Alternatively, and for reasons the court subsequently addresses, it is inevitable that the Gateway would have been seized.  *See infra* text Part VI § E. at pp. 56-60.

### 3.  **The Desktop and Desk Drawer Items**

The seizure of the desktop and desk drawer items during Search One was constitutionally impermissible.

Like the Gateway, these items were not within the scope of O'Brien's original consent.  For the reasons the court has already articulated, the desktop items were in plain view and given Sheeley's observations about them, there was probable cause to believe that they constituted evidence of contact between O'Brien and female students.  Therefore, Sheeley lawfully occupied the space where he could plainly see them, their incriminating nature was readily apparent, and he had lawful access to them.  However, the desk drawer items were not in plain view.  Sheeley exceeded the scope of the original written consent when he searched the drawers.  While he believed that the original consent included things such as computer manuals that might reasonably be located in a desk drawer

---

admissions to establish his privacy interest, and discounted the trial court's factual finding that O'Brien lied at the time of the seizure.  *See O'Brien*, 2 A.D.3d at 1225.  Furthermore, this court has discredited O'Brien's claim that he protested the seizure.

next to a computer, he was wrong.  A reasonable police officer executing a consent search is responsible for ascertaining the scope of the authorization given.  He did not.  Because Sheeley searched a location beyond the scope of the consent provided, he did not have lawful access to the space where the objects could be plainly seen, nor did he have lawful access to the objects themselves.  Accordingly, the seizure of those items cannot be justified by the plain view doctrine.

As for the desktop items, the plain view doctrine would have applied had Sheeley immediately seized them because each of the three plain view elements were initially satisfied.  Unlike the desk drawer items, Sheeley had lawful access to the desktop items pursuant to O'Brien's written consent.  However, he commingled the desk drawer items with those on the desk, and the government failed to offer any proof distinguishing the two categories as was its burden to do.  Absent any basis to distinguish items lawfully seized from those unlawfully seized, the court must order suppression unless some other theory supports admissibility.

The government urges consent as one alternative.  Careful analysis of the sequence of events, however, reveals no factual support for the government's argument.  When Schatzel saw the Gateway, he immediately

sought permission from O'Brien to take it, and O'Brien consented.  The

desktop and desk drawer items were no part of that conversation.  Instead,

those items were impermissibly retrieved - at least in part - and the desk

drawer invasion generated O'Brien's protest.  As a result of that protest, the

police ceased their search, and O'Brien told them to take what they had

gathered and leave.  Under the circumstances, "take what you have

gathered" might be construed as permission, but an objective evaluation of

all circumstances reflects that such permission was not voluntary.  Instead,

it was no more than non-resistance or mere submission to lawful authority,

neither of which supports consent.  This conclusion might differ if there was

some means to distinguish the desktop and desk drawer items, but again

the government has offered no proof to support the distinction.

Accordingly, the desktop and desk drawer items must be suppressed

unless some other alternative justifies admission.

Alternatively, and for reasons the court next addresses, it is inevitable

that both the desktop and desk drawer items would have been seized.  *See*

*infra* text Part VI § E. at pp. 56-60.

### E.  Searches Two and Three, Statement Four and Inevitable Discovery

56

The only argument O'Brien asserts regarding the Search Two and Three warrants is that they were tainted by prior unconstitutional conduct. Accordingly, he has waived all other arguments. Nonetheless, the court makes several observations about the warrant process given its impact on the inevitable discovery analysis.

The warrants were issued by a neutral and detached judge. They were supported by sworn Sheeley applications, and the applications and warrants specifically described the places to be searched and the items to be seized. The subsequent searches were within the scope of the authorization given.

As for probable cause, the totality of the information supplied the judge - independent of any information concerning the desktop or desk drawer items - supported issuance of the warrants. That observation is especially so because the test is whether the issuing judge had a substantial basis for finding probable cause. Furthermore, even if the judge was wrong in his probable cause determination, it was objectively reasonable for Sheeley to rely in good faith on the judge's determination. There was nothing false in Sheeley's disclosures to the court, the judge did not abandon his neutral role, and Sheeley's application was not so lacking

57

in probable cause nor the warrant so facially deficient that a reasonable police officer would have recognized as much.  Lastly, although the first warrant authorized seizure, *inter alia*, of notes and correspondence from O'Brien's bedroom, that information was not tainted because those items were readily apparent on the desktop when the consent search was executed.  The forensic examination authorized by the Search Three warrant was untainted because it did no more than authorize access to that which had already been constitutionally seized.

Additionally, the warrant process was inevitable.  Viewing affairs as they existed the moment before any constitutional violation - potential or otherwise - the court has already factually found that Schatzel or Sheeley would have sought a warrant, if necessary, at each stage of the unfolding events.  Although Statement One was voluntary and O'Brien concedes the validity of his written consent, Schatzel would have sought and obtained a search warrant absent that consent.[8]  Once at the house and absent permission, Schatzel would have posted a guard and obtained a warrant authorizing seizure of the Gateway.  Despite the unlawful seizure of the

_____

[8]Whether Statement One or any other statement violated *Miranda* is irrelevant because a *Miranda* violation does not poison searches.  *See U.S. v. Patane*, 542 U.S. at 640.

notes and correspondence on the desktop and given the material left

behind in the desk drawers, it was inevitable that Schatzel would do as

Sheeley did - obtain a search warrant and seize all of those items.  The

warrant Sheeley actually obtained was supported by probable cause

independent of the notes and correspondence, and his decision to seek the

warrant was not prompted by those items.

In summary and regarding the searches, all evidence except the

notes and correspondence seized from the desk is alternatively admissible

because of the independent source and attenuation principles associated

with the derivative evidence doctrine.  The notes and correspondence are

admissible on the basis of those principles alone.

Finally, Statement Four is admissible, a conclusion requiring no

extended analysis.  The July 12 interview occurred almost two months after

O'Brien's initial police encounters, and more than one month before his

ultimate arrest.  The interview was scheduled through O'Brien's attorney,

lasted one hour, and was conducted in the presence of both O'Brien's

attorney and father.  *Miranda* warnings were unnecessary since O'Brien

was clearly not in custody.  No facts suggest any coercive police conduct

or conditions of interrogation that would render the statement involuntary.

Furthermore, there was no underlying unconstitutional conduct that could have tainted the conversation and, in any event, any taint would have been attenuated by the lapse of time and O'Brien's voluntary decision to speak.

## VII. <u>Conclusion</u>

For the various and alternative reasons recited in this opinion, all four of O'Brien's statements and all evidence seized during the three searches are admissible.  Accordingly, it is hereby

Ordered that O'Brien's motion to suppress statements and evidence (*Dkt. No. 18*) is denied; and it is further

Ordered that the Clerk of Court shall contact the parties and schedule a date for either a plea or trial within the parameters of the time remaining under the Speedy Trial Clock.

Albany, New York
Dated: August 1, 2007

Gary L. Sharpe
U.S. District Judge